UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TE CONNECTIVITY
CORPORATION,

      Plaintiff/Counter-Defendant,

                                 Case No. 22-cv-10283
v.                                Honorable Linda V. Parker

SUMITOMO ELECTRICAL WIRING
SYSTEMS, INC.,

      Defendant/Counter-Plaintiff.
_____/

### OPINION AND ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND GRANTING COUNTER-PLAINTIFF SUMITOMO ELECTRICAL WIRING SYSTEM, INC.'S MOTION TO FILE AN AMENDED COUNTERCLAIM

This is an automotive supply chain dispute arising from the alleged late delivery of goods by Plaintiff/Counter-Defendant TE Connectivity Corporation ("TE") to Defendant/Counter-Plaintiff Sumitomo Electrical Wiring Systems, Inc. ("SEWS"), after the onset of the COVID-19 pandemic.  TE initiated this diversity action against SEWS on February 11, 2022, seeking a declaration that the parties need not submit their dispute to arbitration.  (ECF No. 1.)  In response, SEWS moved to dismiss and compel arbitration.  (ECF No. 6.)  On December 5, 2022, the Court denied SEWS' motion, holding that it could not determine as a matter of law

that the arbitration provision in SEWS' Terms and Conditions governed the parties' dealings. (ECF No. 11.)

Thereafter, SEWS filed an Answer (ECF No. 12) and Counterclaim for breach of contract (ECF No. 13), and the Court entered a scheduling order setting deadlines for *inter alia* discovery and dispositive motions (ECF No. 19). Those deadlines were subsequently extended several times by stipulated order, in part due to discovery disputes, with the final order setting a discovery deadline of April 9, 2025. (*See* ECF Nos. 30, 34, 61, 73.) One of those disputes related to the deposition of TE's corporate designee pursuant to Federal Rule of Civil Procedure 30(b)(6) (*see* ECF No. 90), which eventually occurred on May 13, 2025.

Shortly after the deposition, SEWS filed a motion pursuant to Federal Rule of Civil Procedure 15 to amend its counterclaim to add as a Counter-Defendant TE's Mexico affiliate, Tyco Electronics Mexica S. de R.L. de C.V. ("TE Mexico"), as more than half of the purchase orders at issue were filled by that entity.[1] (ECF No. 114.) SEWS also sought to add alter ego and agency theories of liability against TE with respect to the TE Mexico purchase orders. (*See id.*) SEWS' motion has been fully briefed and is pending before the Court. (*See* ECF Nos. 121, 125, 162, 163.) Also pending are the parties' cross-motions for summary judgment

---

[1] On June 10, 2025, SEWS also filed a separate action against TE and TE Mexico, Case No. 25-cv-11741. TE has answered the complaint. SEWS is pursuing service on TE Mexico.

pursuant to Federal Rule of Civil Procedure 56 on TE's breach of contract counterclaim, which are also fully briefed.  (ECF Nos. 126, 131, 134, 135, 143, 144.)  Finding the facts and legal arguments adequately set forth in the parties' briefs with respect to the pending motions, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.        Applicable Standards

### A.        Motion to Amend

Pursuant to Rule 15(a), leave to amend is "freely" granted "when justice so requires."  *See* Fed. R. Civ. P. 15(a).  The United States Supreme Court has advised that a plaintiff should be allowed the opportunity to test a claim on the merits if the facts and circumstances underlying the claim suggest that it may be a proper subject of relief.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, the Court further instructed that a motion to amend a complaint should be denied if the amendment would be futile, is brought in bad faith or for dilatory purposes, or results in undue delay or prejudice to the opposing party.  *Id*.

Notably, delay, on its own, is not sufficient reason to deny a requested amendment.  *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001) (citations omitted).  "Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted."  *Id.* (citation and quotation marks omitted).  Futility is judged according to the standard

3

for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (citing *Rose v. Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)).

### B.      Summary Judgment

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248). The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

"These standards do not change when parties advance cross-motions for summary judgment." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387

4

(6th Cir. 2016).  The Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Frenchko v. Monroe*, 160 F.4yh 784, 795 (6th Cir. 2025) (quoting *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003)).

## II.     Factual Background

### A.     The Parties and Parts at Issue

SEWS is a Tier 1 automotive supplier which manufactures and supplies finished wire harness products ("Finished Goods") for Original Equipment Manufacturers ("OEMs") and other Tier 1 suppliers.  (ECF No. 2 at PageID.15-16 ¶ 6.)  TE is considered a Tier 2 supplier, and it supplies connector and terminal components for automative and other applications.  (ECF No. 1 at PageID.2 ¶ 1.) TE Mexico is affiliated with TE, although they are separate legal entities.  (ECF No. 121-10 at PageID.5586 ¶¶ 6, 10.)

### B.     The Order Process and Orders at Issue

After SEWS is selected by its OEM customers as a "Tier I supplier," it issues a request for quotation to the suppliers of the parts SEWS needs to manufacture its Finished Goods, such as TE.  (ECF No. 1 at PageID.10 ¶ 4.)  Each Finished Good can require hundreds of separate sub-components from various Tier 2 suppliers.  (ECF No. 131-3 at PageID.16580.)  TE thereafter issued quotations

for the parts, which incorporated by reference TE's Terms and Conditions of Sale ("TE's T&Cs").  (*Id.*; *see also, e.g.,* ECF No. 129-1.)

TE's quotations state that its "acceptance of customer's order is expressly conditioned upon customer's acceptance of all TE Connectivity standard Terms and Conditions of Sale set forth on TE Connectivity's website . . .."  (*See, e.g.,* ECF No. 126-8.)  TE's T&Cs provide that TE's "acceptance of any offer or order of Buyer is hereby expressly made in reliance on Buyer's assent to all terms and conditions hereof."  (ECF No. 7-2 at PageID.177.)  They also require buyers to issue a written objection "within ten (10) calendar days after placing a purchase order" and state that "failure to so object shall be conclusively deemed to be acceptance of the terms and conditions hereof."  (*Id.*)

On a weekly basis, SEWS receives from its OEM customers, via electronic data interchange ("EDI"),[2] releases for certain quantities of Finished Goods, along with a forecasted delivery schedule.  (ECF No. 131-2 at PageID.16563; ECF No. 131-23 at PageID.16860.)  SEWS then develops a production plan to identify the parts and quantities it needs from its suppliers to meet the OEM's Finished Goods

---

[2] As SEWS explains, parties to a manufacturing relationship use different enterprise resource planning ("ERP") or material requirements planning ("MRP") systems.  (*See* ECF No. 131 at PageID.16519 n.4.)  "As transmitted to or from a buyer or supplier, EDI is a jumble of electronic information unreadable by humans."  (*Id.*)  TE uses an intermediate document exchange ("IDOC") to convert SEWS' EDI to something readable by TE's ERP system.  (ECF No. 131-5 at PageID.16602.)

production requirements for the given week.  (ECF No. 131-2 at PageID.16563-64.)  SEWS then issues discrete purchase orders ("POs") to its suppliers for specified quantities of specific parts.  (ECF No. 131-2 at PageID.16560.)

SEWS sends forecasts of its parts' requirements to TE at two sets of regular intervals.  A 12-month ("yearly") forecast sent in March and September, which includes the number of parts SEWS anticipates ordering on a weekly basis and monthly basis.  (ECF No. 131-2 at PageID.16563, 16566.)  SEWS also sends 6-month forecasts of parts to TE weekly and contemporaneously with its weekly POs for parts via EDI and email.  (*Id.* at PageID.16566-67.)  SEWS expects that its suppliers will use these forecasts to order the materials they need to produce and timely deliver the parts to SEWS.  (*Id*. at PageID.16567.)

Meanwhile, TE communicates "lead times"—the time it needs between order placement and delivery—to Tier 1 suppliers like SEWS, which TE expects will be incorporated into the Tier 1 supplier's system and used when issuing POs. (ECF No. 135-65 at PageID.18999; *see also* ECF No. 135-43 at PageID.18671.) SEWS indicates that it in fact incorporated those lead time estimates and delivery capacity outlooks into its system, which were used to populate the "Delivery Date" fields on the POs it issued to TE.  (ECF No. 131-2 at PageID.16571.)

SEWS' POs incorporate by reference SEWS' Global Terms and Conditions ("SEWS' T&Cs").  (*See, e.g.*, ECF No. 133-1 at PageID.17046-63.)  The POs

contain a hyperlink to SEWS' T&Cs, listed on SEWS' internet website.  (*See id*.)

SEWS' T&Cs provide that "[u]nder no circumstances shall the Purchase Order

include any terms and conditions proposed by Supplier . . . whether included on a

Supplier invoice or written acceptance of a Purchase Order or otherwise, unless

such Supplier Terms and Conditions are expressly accepted in writing executed by

an authorized person on behalf of Buyer."  (ECF No. 131-8 at PageID.16763-64

§ 1.3.)

Between September 28, 2020 and February 28, 2023 (the "Claim Period")

SEWS issued 1,491 POs to TE and 1,850 POs to TE Mexico, for a total of 3,341

POs.  While SEWS regularly ordered hundreds of different component parts from

TE, fifty discrete parts (hereafter "Parts") are at issue in this lawsuit.  (ECF No. 35

at PageID.324.)

When TE receives a PO, its planning system, known as Systems,

Applications and Products in Data Processing ("SAP"), analyzes aggregate

customer demand (present and forecasted), available inventories, capacity, delivery

lead times, and availability of raw materials.  (ECF No. 126-12 at PageID.5938-

39.)  SAP then generates and transmits an Order Acknowledgement ("OA") to the

buyer.  (ECF No. 131-5 at PageID.16588.)  TE issued OAs to SEWS for 1,489 of

the 1,491 POs between TE and SEWS that are at issue.  (*See* ECF No. 126-34;

ECF No. 126-21; *see also* ECF No. 133-2.; ECF No. 133-4.)

TE used two different OAs during the Claim Period.  (*See* ECF Nos. 129-4, 129-11.)  One version provided: "All sales are subject to the TE Connectivity standard terms and conditions, which have been previously provided to purchaser . . ..  The TE Connectivity standard terms and conditions may only be modified upon the written consent of TE Connectivity."  (ECF No. 129-4.)  Section 1 of TE's T&Cs expressly states that TE's "acceptance of any offer or order of Buyer is hereby expressly made in reliance on Buyer's assent to all terms and conditions hereof."  (ECF No. 7-2 at PageID.177.)  The other version included this language:

> SEE CURRENT TERMS AND CONDITIONS
>
> SEE CURRENT TERMS AND CONDITIONS
> AT: https://www.te.com/usa-en/policies-agreements/terms-of-use-te-com/terms-conditions-sale.html  This quotation is provided for information purposes only and shall not be construed as an offer to sell and is subject to change without notice.  TE Connectivity's acceptance of customer's order is expressly conditioned upon customer's acceptance of all TE Connectivity's standard Terms and Conditions of Sale set forth on TE Connectivity's website ("Standard Terms").  Except as otherwise expressly agreed to in a writing executed by an authorized representative of TE Connectivity's, all sales are controlled by and subject to only the standard terms, which shall be deemed and hereby specifically incorporated by reference in to [sic] any agreement for the sale of TE Connectivity's product(s). All prices are subject to all applicable state and/or local sales taxes.  Terms are subject to credit department approval.

(ECF No. 129-11.)

With respect to delivery, TE's OAs either (a) proposed the same estimated delivery date reflected in the PO, (b) provided a different estimated delivery date other than the one set forth on the PO, or (c) indicated the delivery date scheduled as "to be confirmed." (*See* ECF No. 129-4; ECF No. 129-11.) The OAs provided that TE's delivery obligation was satisfied when it tendered delivery at its dock.[3]

## D.   Delivery Issues

Beginning in August 2020, TE began delivering Parts to SEWS on a schedule different than what was included in SEWS' POs. This continued through the Claim Period.

On October 12, 2020, TE sent SEWS an updated list of lead times (a "lead time alignment") for parts purchased by SEWS and scheduled a meeting to discuss the matter. (*See* ECF No. 135-41 at PageID.18648.) At a meeting between representatives from TE and SEWS on October 30, SEWS agreed to update its lead times to those on TE's updated list, effective on agreed dates. (ECF No. 131-5 at

---

[3] The OAs referenced "EXW EX WORKS" or "FCA SHIPPING POINT." (*See* ECF No. 129-4; ECF No. 129-11.) "Ex works" is a "trade term" which means that "[t]he seller's delivery is complete (and the risk of loss passes to the buyer) when the goods are made available to the buyer at a location of the seller's choice without requiring a collecting vehicle to be loaded . . .." *Black's Law Dictionary* (12th ed. 2024); (*see also* ECF No. 135-16 at PageID.18506-07.) "FCA SHIPPING POINT" means that the buyer is paying for the freight costs of delivery after the seller delivers the goods to the designated point. *See W. Exp. Servs. v. Webtrans Logistics, Inc.*, No. CV 19-04279, 2022 WL 1601384, at *3 (C.D. Cal. Apr. 11, 2022).

PageID.16599.) TE agreed to allow a "grace period"—the difference between the old lead time and new lead time—until the "effective date" indicated on the final lead time alignment list. (ECF No. 131-5 at PageID.16594-95, 16599-600; ECF No. 133-9.) SEWS claims that TE nevertheless continued to deliver parts late through the end of the Claim Period.

TE identifies several factors that it claims required adjustment to the delivery dates for the Parts. The first is the COVID-19 pandemic, which began in March 2020. The global shutdown of nonessential activities for several months led to delays even after operations resumed. After restrictions were lifted in Summer 2020, manufacturing capacity was still impacted by (a) governmental regulations and/or guidance to protect employee health and safety and (b) labor shortages due to increased absences and FMLA leave. (ECF No. 126-6; ECF No. 126-35 at PageID.7673; ECF No. 140-4.) Automotive suppliers at all levels of the supply chain—OEMs, Tier 1 and Tier 2 suppliers, and raw material suppliers—were impacted.

The second factor was a severe winter storm from February 11-20, 2021, known as the "Great Texas Freeze." (ECF No. 135-15.) The Great Texas Freeze impacted TE's manufacturing capacity and deliveries, particularly as parts passed through El Paso, Texas, on their way to SEWS' manufacturing plants in Mexico. (*See* ECF No. 135-15; ECF No. 135-16 at PageID.18510-11.) The storm crippled

11

Texas and sections of Mexico, and its impact was felt for weeks after the severe weather subsided.  (ECF No. 135-15.)  The storm cut off the shipment of Parts from TE to SEWS. (ECF No. 140-7 at PageID.19447; ECF No. 140-5 at PageID.19436.)  SEWS acknowledged the storm's impact on TE's shipments.  (ECF No. 135-19.)  As a result of the storm, SEWS itself declared force majeure to its customers.  (ECF No. 140-9.)

The Great Texas Freeze also caused a global shortage of critical resins, which are raw materials used by several of SEWS' key Tier 2 suppliers, including TE.  (*See* ECF No. 135-39; ECF No. 140-10; ECF No. 140-11.)  There were shortages of other raw material metals during the Claim Period.  (ECF No. 135-28 at PageID.18581-52.)  A flood in Germany also impacted metal supplies during this period.  (*Id.*; ECF No. 135-29; ECF No. 135-30.)

SEWS contends that TE's delays also resulted from TE's own doing.  Specifically, SEWS argues that TE's execution of its "Project Titan," which SEWS describes as a large-scale relocation of production capacity for the subject Parts from North Carolina to Mexico, disrupted TE's manufacturing capabilities.  (*See* ECF No. 131-20 at PageID.16826-28; ECF No. 131-21; ECF No. 131-26 at PageID.16871-72; ECF No. 131-24.)  TE disputes the impact of the project on its manufacturing and delivery of the Parts.

12

TE initiated Project Titan in 2019 to increase capacity.  (ECF No. 135-49 at PageID.18714-15.)  The project involved moving stamping presses and related tooling from one TE facility in Greensboro, North Carolina, to an optimized and enlarged TE facility also in Greensboro.  (ECF No. 140-23.)  Less technical production of certain molded parts and assembly of some parts were moved to TE's affiliated *maquiladoras* in Mexico.

TE completed Project Titan in September 2020, and submitted its validation approvals to SEWS.  (ECF No. 135-51; ECF No. 140-24.)  When SEWS claimed that TE was past due because of Project Titan in late 2020, TE found no performance issues on 49 of the 67 Parts.  (ECF No. 135-53 at PageID.18734.)  TE also was waiting for SEWS to approve long outstanding production parts approval process submissions provided by TE relating to its relocation of the equipment and tooling as part of Project Titan.  (ECF No. 135-51; ECF No. 140-24.)

SEWS also contends that TE accepted more POs than it could fulfill by the PO delivery date.  (ECF No. 131-27 at PageID.16876; ECF No. 131-28 at PageID.16880.)  TE unilaterally changed the delivery dates without flagging the change for SEWS.  (ECF No. 131-5 at PageID.16596-98; ECF No. 131-26 at PageID.16870.)

SEWS claims that, between July 1, 2020 and March 31, 2021, it incurred $26.1 million in damages due to the delayed shipment of the Parts in the 3,341

POs.  (ECF No. 1 at PageID.5.)  When the parties' attempts to negotiate the matter were unsuccessful, SEWS served TE with a Notice of Arbitration.  (*Id*. at PageID.7-8 ¶¶ 26-31.)  TE responded by filing the present lawsuit.

## III.    Applicable Law and Analysis – Breach of Contract

### A.    POs Issued to TE

The parties each claim entitlement to summary judgment on SEWS' breach of contract counterclaim against TE.  Under Michigan law,[4] SEWS must demonstrate a contract between the parties, breached in some way by TE, resulting in damages to SEWS.  *Miller-Davis, Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).  "At its most basic level, a contract is formed when there is an offer, acceptance, and consideration."  *Cooper-Std. Auto. Inc. v. Daikin Am., Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021).

The parties begin their analysis from the shared position that SEWS' POs or Scheduling Agreements—rather than TE's Quotations—constituted the initial

---

[4] For most of this litigation, both sides have proceeded as if Michigan law governs this dispute.  SEWS includes citations to Kentucky law in its pending summary judgment motion, as well as Michigan law, "in the event this Court finds Kentucky law applies" (*see* ECF No. 131 at PageID.16537 n.10).  As the law of both States are substantively the same with respect to SEWS' counterclaim, the Court finds it unnecessary to resolve which forum's laws apply.  The Court need only conduct a choice-of-law analysis if the States' laws conflict.  *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008) (citing *Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005)) (indicating that, where the States' laws are consistent, this makes "any asserted conflict of laws a false conflict.")  For simplicity, the Court cites Michigan law, only.

offers.  (*See* ECF No. 6 at PageID.11 at PageID.75; ECF No. 7 at PageID.158.)

TE's OAs in response to the POs contained different and additional terms.

Michigan's version of Article 2 of the Uniform Commercial Code, Michigan

Compiled Laws § 440.2207, dictates whether these exchanges resulted in contracts

and, if so, their terms.  *See Grosse Pointe Law Firm, PC v. Jaguar Land Rover N.*

*Am., LLC*, 894 N.W.2d 700, 703 (Mich. Ct. App. 2016).

> Section 440.2207, known as the "Battle of the Forms" provision, reads:
>
> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless* acceptance is *expressly made* conditional on *assent* to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> (a) the offer expressly limits acceptance to the terms of the offer;
>
> (b) they materially alter it; or
>
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

15

Mich. Comp. Laws § 440.2207 (emphasis added).  Subsection (1) "provides as a general rule that an acceptance is effective although it states terms which are additional to or different from those in the offer."  *Ralph Shrader, Inc. v. Diamond Int'l Corp.*, 833 F.2d 1210, 1213 (6th Cir. 1987).  There is a proviso to this general rule, however: "an acceptance is not effective if the acceptance is expressly conditional on assent."  *Id.*  Stated differently:

> [U]nder Subsection (1), a contract is recognized notwithstanding the fact that an acceptance or confirmation contains terms additional to or different from those of the offer or prior agreement, *provided* that the offeree's intent to accept the offer is definitely expressed, . . . *and* provided that the offeree's acceptance is not expressly conditioned on the offeror's assent to the additional or different terms.

*Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1166 (6th Cir. 1972) (emphasis added).

"The conditional assent provision has been narrowly construed to require that the acceptance must clearly reveal that the offeree is *unwilling to proceed* unless *assured of the offeror's assent* to the additional or different terms."  *Challenge Mach. Co. v. Mattison Mach. Works*, 359 N.W.2d 232, 235 (Mich. Ct. App. 1984) (emphasis added) (citing *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir. 1979) and *Dorton*, 453 F.2d at 1168).  "That the acceptance is predicated on the offeror's assent must be directly and distinctly

16

stated or expressed rather than implied or left to inference." *Dorton*, 453 F.2d at 1168 (quotation marks and citation omitted).

In *Challenge Machinery*, the court held that this provision did not generate a conditional acceptance: "buyer expressly limits acceptance to the terms hereof and no different or additional terms proposed by seller shall become part of the contract." 359 N.W.2d at 234, 235. Nor was a conditional acceptance generated by the seller's statement in *Dorton* that its acceptance "is subject to" its terms and conditions. 453 F.2d at 1164, 1168. The same conclusion was reached in *Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x 503 (6th Cir. 2006), where the "PO stated that acceptance was limited to its terms" but "did not clearly indicate that [the other party's] failure to [assent to those terms] voided the transaction." *Id*. at 506.

In comparison, in *Ralph Shrader*, the Sixth Circuit found that the seller c[ould] be no clearer in conditioning acceptance than it was in stating, "The terms set forth on the reverse side are the *only ones upon which we will accept orders*." 833 F.3d at 1215 (emphasis in original). In *SFEG Corporation v. Blendtec, Inc.*, No. 3:15-cv-0466, 2017 WL 395041 (M.D. Tenn. Jan. 30, 2017) (unpublished), language that "[t]he Seller's acceptance of any order is expressly subject to Buyer's assent to each and all of the terms and conditions set forth below" was found to "essentially mirror[] that of the § 2- 2701(1) proviso[.]" *Id*. at *6. Similarly, here, the language in TE's OAs stating that its "acceptance of [SEWS']

17

order is expressly conditioned upon [SEWS]' acceptance of all TE Connectivity's standard Terms and Conditions" conveyed that acceptance was limited to the terms in TE's T&Cs and SEWS' assent to those terms.  This conclusion—which the Court reached when deciding the motion to dismiss—is not challenged by SEWS here.

SEWS does contest whether it assented to TE's T&Cs.  SEWS maintains that it never expressly assented.  While TE's Order Acknowledgements contemplated SEWS' assent through mere silence (*see* ECF No. 6-2 at Pg ID 89), SEWS argues that its silence and receipt and payment of the Parts was not sufficient to constitute "assent" under § 2-207.  The Court agrees.

The cases TE cites in support of its argument that silence is sufficient do not address the manner of accepting a conditional acceptance in the context of § 2-207.[5] For example, in *Kvaerner U.S., Inc. v. Hakim Plast Co.*, 74 F. Supp. 2d 709 (E.D. Mich. 1999), the buyer did issue a conditional acceptance, but the seller did not

---

[5] Several of the cases TE cites do not even involve a sale of goods governed by the Uniform Commercial Code.  *Rood v. General Dynamics Corp.*, 507 N.W.2d 591 (Mich. 1993), involved an employment dispute.  *Wadsworth v. N.Y. Life Insurance Co.*, 84 N.W.2d 513 (Mich. 1957), involved a life insurance policy.  *City of Auburn v. Brown*, 230 N.W.2d 385 (Mich. Ct. App. 1975), was an action by a city to collect from a property owner on a street improvement program.  In addition to being an out-of-circuit, unpublished case, the district court in *Oklahoma Gas & Electric Co. v. Toshiba International Corp.*, No. CIV-14-0759, 2016 WL 3659941 (W.D. Okla. July 1, 2016), concluded that the parties' contract was one for services, not governed by the UCC.  *Id*. at *3.

respond. *Id.* at 713. The next communication between the buyer and seller was a request by the buyer for the seller to extend its initial offer, which the seller did. *Id.* The buyer's subsequent performance was deemed to constitute acceptance *of the original, extended offer*. *Id.* at 713-14.

The Sixth Circuit, upon review of Michigan case law, has held that silence and receipt and payment of goods do not constitute assent to the terms in a conditional acceptance. *Ralph Shrader, Inc. v. Diamond Int'l Corp.*, 833 F.2d 1210, 1215 (1987). TE offers no other evidence of SEWS' assent to the terms in its conditional acceptance. In that instance, as TE and SEWS agree, if the parties' conduct reflects that a contract exists, which TE and SEWS also agree their conduct does, § 2-207(3) comes into play. "In that case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of [the UCC]." Mich. Comp. Laws § 440.2207(3).

Another point of agreement between TE and SEWS is that the delivery terms in SEWS' POs and TE's OAs conflict. (*See, e.g.*, ECF No. 126 at PageID.5805; ECF No. 131 at PageID.16541.) Where the parties' terms conflict, the UCC provides the missing terms. *See* Mich. Comp. Laws § 440.2207(3); *see also Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 643-44 (6th Cir. 2004) (explaining that where the parties recognized the existence of a contract but their

19

writings expressly disagreed on price, the district court will "look to the U.C.C.'s relevant gap-filling provision"). Under the Michigan Commercial Code, the default time for performance, when not otherwise specified, is "a reasonable time." *Skyline Prods., Inc. v. Posen Constr., Inc.*, 430 F. App'x 485, 494-95 (6th Cir. 2011) (quoting *Surefil, LLC v. Bonne Bell, LLC*, No. 1:09-cv-379, 2010 WL 3059209, at *4 (W.D. Mich. Aug. 4, 2010) (quoting Mich. Comp. Laws 440.2309(1)).

As the Commentary to § 440.2309 provides, "[t]he reasonable time under this provision turns on the criteria as to 'reasonable time' and on good faith and commercial standards set forth in Sections 1-304 [obligation of good faith], 1-205[,] and 1-201. It thus depends upon what constitutes acceptable commercial conduct in view of the nature, purpose[,] and circumstances of the action to be taken." This is a fact-intensive inquiry. As the parties' briefs reflect, there are numerous competing arguments for why TE's delivery dates were or were not reasonable. This is clearly a question to be resolved by a jury.

As such, the Court cannot conclude that either party is entitled to summary judgment on SEWS' breach of contract counterclaim as to the 1,489 POs that SEWS directed to TE and for which TE sent OAs in return.[6]

---

[6] The parties inadequately address, if they do so at all, the two POs SEWS sent TE, for which no OA was issued. The focus with respect to the POs lacking responsive OAs is on those POs issued to TE Mexico. Therefore, at this time, the Court

### B. POs Issued to TE Mexico

Of the 3,341 POs at issue in this lawsuit, 1,850 were issued by SEWS to TE Mexico. Thus, the resulting contract is between SEWS and TE Mexico—an entity which is currently not a party to this lawsuit and is undisputedly a distinct entity from TE.[7] As such, it is premature to assess SEWS' breach of contract claim to the extent based on those 1,850 POs.

The Court is therefore denying without prejudice the parties' request for summary judgment on SEWS' breach of contract counterclaim, to the extent based on the POs SEWS sent to TE Mexico.

## IV. Amended Counterclaims

As indicated earlier, SEWS seeks to amend its counterclaim to include TE Mexico as a Counter-Defendant and to assert alternative theories of liability to hold TE liable for the breach of the POs directed to TE Mexico. SEWS maintains the amendment is necessary because TE began distinguishing itself from TE Mexico only recently—i.e., about two weeks before the motion to amend was filed—during the deposition of SEWS' corporate designee. According to SEWS,

---

declines to decide whether either side is entitled to summary judgment with respect to those 2 POs.

[7] While SEWS may be able to demonstrate TE's liability for any demonstrated breach by TE Mexico, such a theory of liability is not yet part of this lawsuit. Nor has the issue been fully briefed.

TE had not previously distinguished itself from TE Mexico in any way, and in fact acted for TE Mexico throughout the parties' business dealings and prelitigation negotiations and during the earlier phases of this lawsuit. TE defended SEWS' breach of contract claim as to all 3,341 POs, never raising any legal defenses relating to the fact that TE Mexico is not a party to this action, even though more than half of the POs were directed to that entity.

TE responds that SEWS' proposed amendment is untimely and prejudicial. SEWS also contends that it would be futile for TE to amend its counterclaim to include alternative theories for holding TE liable for breach of the POs directed to TE Mexico. TE also argues futility as to any PO calling for the delivery of Parts more than four years before SEWS filed its original counterclaim. TE maintains that the applicable statute of limitations precludes SEWS from bringing a breach of contract claim as to those POs.

### A.    Delay and Prejudice

TE argues that SEWS has known from the day it issued its POs who the proper defendant was for those issued to TE Mexico and that waiting until after the discovery deadline to add TE Mexico as a defendant is prejudicial. TE maintains that additional discovery also will be needed with respect to the alternative theories of liability SEWS seeks to advance against it.

22

While SEWS may have known that TE Mexico fulfilled certain POs, SEWS claims it believed TE Mexico was a maquiladora, not a separate entity. (*See* ECF No. 114 at PageID.5006; see also ECF No. 114-12 at PageID.5099.) Under the facts presented at this time, the Court cannot conclude that SEWS' understanding was unreasonable. As soon as TE clearly took the position that TE Mexico is an independent entity, for which TE lacks liability, SEWS moved to add TE Mexico as a party.

While discovery may have closed, SEWS' proposed amendments do not alter the claim asserted in its initial complaint. Discovery on that claim covered the POs issued to TE Mexico. TE Mexico was aware of SEWS' breach of contract claim well before this lawsuit was filed, and its representatives have been deposed in this litigation. Moreover, the parties agreed to engage in discovery beyond the discovery deadline, including the Rule 30(b)(6) depositions where TE first clearly took the position that it bears no liability for TE Mexico's alleged delays.

It seems unlikely that discovery will need to be reopened. Neither TE nor TE Mexico need to engage in discovery to understand their own formal or operational relationship. To the extent any discovery is needed, it will be narrow and not delay any trial in this matter. The Court cannot ignore that any delay and prejudice is to some degree due to TE's earlier failure to clearly assert the

23

independence of the two entities and its denial of liability as to the POs issued to TE Mexico.

### B.     Futility

TE argues that SEWS alleges insufficient facts to support its alter ego or agency theories of liability against TE, and that the applicable four-year statute of limitations bars any breach of contract claim against TE Mexico based on the 811 POs calling for shipping dates before May 29, 2021.

#### 1.     Alter Ego Theory

Under Michigan law, separate business structures are not "fictions"; instead, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 537 N.W.2d 221, 224 (Mich. 1995) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947)).  "This presumption, often referred to as a 'corporate veil,' may be pierced only when an otherwise separate corporate existence has been used to 'subvert justice or cause a result that is contrary to some overriding public policy.'" *Id*. (quoting *Wells v. Firestone*, 364 N.W.2d 670, 674 (Mich. 1984)) (brackets omitted).  A plaintiff seeking to pierce the corporate veil generally must show that (1) the corporate entity is "a mere instrumentality" of another entity or individual; (2) the corporate entity was used to commit a wrong; and (3) the plaintiff suffered an unjust loss. *Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 271 (6th Cir. 2021) (citing *Foodland*

24

*Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996); *Florence Cement Co. v. Vettraino*, 807 N.W.2d 917, 922 (Mich. Ct. App. 2011)). However, the Michigan Supreme Court has "admoni[shed] that there is no mechanical test for determining when the existence of a separate entity must be disregarded and . . . whether to disregard the separate existence of an entity depends on the totality of the circumstances." *Green v. Ziegelman*, 873 N.W.2d 794, 807 (Mich. Ct. App. 2015) (citing *Klager v. Robert Meyer Co.*, 329 N.W.2d 721, 725 (Mich. 1982)) ("This test is not to be applied in a mechanistic fashion. The entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determination if the corporate form has been abused.").

Courts consider a variety of factors when assessing whether one entity is a mere instrumentality of another. *See Anwar v. Dow Chemical Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (citations omitted) (explaining that the factors courts consider under Michigan law are similar to those under federal law, including shared office space, shared board membership, interconnected revenue and capital, support from the parent for the subsidiary in the event of undercapitalization, payroll management, direction of policy and decisions, and shared projects that the parent considers to be its own). SEWS alleges sufficient facts in its proposed amended

25

counterclaim to plausibly plead that TE Mexico is a "mere instrumentality" of TE.[8]

(*See* ECF No. 125-4 at PageID.5752-53 ¶¶ 17-21.)  SEWS also alleges that TE

used TE Mexico to commit a wrong—that being, a breach of contract.  *See Servo*

*Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 799-800 (6th Cir.

2007) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 763 (Mich. 1947);

*Papo v. Aglo Rests. of San Jose, Inc.*, 386 N.W.2d 177, 185 n.15 (Mich. Ct. App.

1986)).  "In considering this element, it is not necessary to prove that the owner

caused the entity to directly harm the complainant; it is sufficient that the owner

exercised his or her control over the entity in such a manner as to wrong the

complainant." *Franklin Cap. Funding, LLC v. Austin Bus. Fin., LLC*, 676 F. Supp.

3d 515, 526 (E.D. Mich. 2023) (quoting *Green v. Ziegelman*, 873 N.W.2d 794, 807

(Mich. Ct. App. 2015)).  Because SEWS claims that TE engaged in the day-to-day

control of TE Mexico, SEWS sufficiently pleads that TE caused the alleged

breach.

It follows that SEWS also plausibly alleges a loss that is unjust.  The

holdings in *Green* and *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475

---

[8] SEWS attached a revised proposed amended counterclaim to its reply brief, which included additional factual allegations to establish that TE Mexico was a mere instrumentality of TE.  (ECF No. 125-3.)  TE did not seek to strike this alternative pleading, nor did it seek to file a sur-reply to address it.  The Court therefore is considering the additional factual allegations when evaluating the plausibility of SEWS proposed amendments.

F.3d 783 (6th Cir. 2007), which TE cites, do not convince the Court otherwise.  In those cases, the party or parties seeking to pierce the corporate veil were not "innocent third parties," lacking "full knowledge of the circumstances surrounding the owner's use of the entity" but "agree[ing] to proceed despite that knowledge." *Green*, 873 N.W.2d at 808 (citing *Klager v. Robert Meyer Co.*, 329 N.W.2d 721, 727 n.6 (Mich. 1982)) (describing "[t]he principle that a plaintiff may not seek to disregard the corporate entity when he is fully aware of the character of the corporation with which he deals").  SEWS plausibly pleads that it lacked full knowledge of TE and TE Mexico's claimed separateness when SEWS contracted for the Parts.

For these reasons, the Court finds that it is not futile for SEWS to assert its alter ego theory to hold TE liable for TE Mexico's alleged breach.

### 2.     Agency Theory

To state a claim for indirect liability under an agency theory, SEWS must plausibly allege an agency relationship between TE and TE Mexico.  Under Michigan law, "fundamental to the existence of an agency relationship is the right to control the conduct of the agent[.]"  *Wigfall v. City of Detroit*, 934 N.W.2d 760, 766 (Mich. 2019) (quoting *Briggs Tax Serv., LLC v. Detroit Pub. Sch.*, 780 N.W.2d 753, 760 (Mich. 2010)).  The same facts supporting a plausible piercing-the-corporate veil theory support a plausible agency theory.

27

### 3.     Statute of Limitations

TE argues that the 811 POs calling for shipping dates prior to May 29, 2001—four years before SEWS moved to include TE Mexico as a party—are barred by the applicable statute of limitations.  TE therefore contends that it is futile for SEWS to amend its counterclaim to assert a breach of contract claim against TE Mexico for those POs.

Rule 15 provides for when an amendment relates back to the original complaint:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).  TE asserts that the requirements to apply subsection (C) are not satisfied here.

First, TE maintains that SEWS is not substituting one party for another with respect to its breach of contract claim.  Rather, it is adding an additional party to the claim.  TE also argues that SEWS was not mistaken as to the proper party's identity.  TE contends that, despite issuing POs to what it knew was a separate entity from TE, "SEWS made a deliberate choice to bring its counterclaim against TE alone and 'fully understood the factual and legal differences' between TE and TE Mexico, which is 'the antithesis of making a mistake concerning the proper party's identity.'"  (ECF No. 121 at PageID.5564-65 (quoting *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 549 (2010).)  Lastly, TE maintains that SEWS has not shown that TE Mexico knew or should have known of SEWS' alleged mistake.

As SEWS argues in its reply, it is in fact seeking to substitute TE Mexico for TE with respect to 1,850 of the 3,341 POs which SEWS claims were breached.  SEWS is "chang[ing] the party" against whom it is asserting breach of contract as to those POs.  With respect to whether SEWS made a mistake, the Supreme Court warned in *Krupski* that "it would be error to conflate knowledge of a party's existence with the absence of mistake."  560 U.S. at 548.  For example, the Supreme Court offered:

> A plaintiff may know that a prospective defendant—call him party A—exists, while erroneously believing him to have the status of party B.  Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to [the plaintiff's] claim.

29

*Id*. at 549.

As discussed already, SEWS shows that it misunderstood the relationship between TE and TE Mexico based on TE's conduct and control over TE Mexico. SEWS apparently did not fully understand the factual and legal differences between the two entities. SEWS sets forth the specific facts which made its apparently erroneous belief reasonable and foreseeable.

Lastly, SEWS establishes that TE Mexico had actual or constructive notice of the lawsuit. *See Berndt v. Tennessee*, 796 F.2d 879, 884 (6th Cir. 1986) (holding that knowledge can be actual or constructive to satisfy Rule 15(c)(1)(C)). TE initiated this action to preclude the arbitration of SEWS' claim of $21.6 in damages due to delayed shipments. Those damages included the POs directed to TE Mexico. Prior to SEWS pursuing arbitration, TE and its counsel reviewed and negotiated SEWS' alleged damages. TE has produced hundreds of documents to SEWS that were maintained by and within the control of TE Mexico and its personnel, and that related specifically to the TE Mexico POs. Individuals simultaneously working for and representing TE and TE Mexico have been deposed.

For these reasons, and because the amendment undisputedly asserts a claim arising out of the transactions set out in SEWS' original pleading, the Court

30

concludes that SEWS' counterclaim against TE Mexico relates back to that original filing. As such, the claim is not futile due to the statute of limitations.

## V. Conclusion

In summary, the Court finds genuine issues of material fact precluding summary judgment in favor of SEWS or TE with respect to the POs directed to TE to which TE issued conditional acceptances. Because all but two of the remaining POs were issued to TE Mexico, and because TE Mexico has not defended against SEWS' breach of contract counterclaim related to those POs, the Court finds it premature to issue a summary judgment ruling as to those separate contracts.

The Court is granting SEWS motion to amend its counterclaim to assert a breach of contract claim against TE Mexico related to the POs directed to it. The Court also is granting SEWS motion to amend its counterclaim to allege alternative theories to hold TE liable for TE Mexico's alleged breach of contract.

Accordingly,

**IT IS ORDERED** that the motions for summary judgment filed by TE (ECF No. 126) and SEWS (ECF No. 131) are **DENIED**.

**IT IS FURTHER ORDERED** that SEWS' motion to amend (ECF No. 114) is **GRANTED**.  Within fourteen (14) days of this Opinion and Order, SEWS shall file the counterclaim filed at ECF No. 125-3.[9]

**SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: May 21, 2026

---

[9] In light of this ruling, the Court instructs counsel to meet and confer to discuss the separate lawsuit SEWS filed against TE and TE Mexico last year, as well as service of the counterclaim against TE Mexico in this case, bearing in mind Rule 1 of the Federal Rules of Civil Procedure which encourages the court and parties to "construe[], administer[], and employ[]" the rules "to secure the just, speedy, and inexpensive determination of every action and proceeding."